**NEW YORK AND CUBA MAIL STEAM-
SHIP CO., a Maine Corpora-
tion, Plaintiff,**

v.

**Sinclair WEEKS, Secretary of Commerce,
Louis S. Rothschild, Undersecretary of
Commerce for Transportation, and
Clarence G. Morse, Administrator, Unit-
ed States Maritime Administration, De-
fendants.**

**Civ. A. No. 5650-55.**

United States District Court
District of Columbia.
April 19, 1957.

Martin J. McNamara, Jr., Washington,
D. C., Goodwin, Rosenbaum, Meacham &
White, Washington, D. C., of counsel,
for plaintiff.

Oliver Gasch, U. S. Atty., Washington,
D. C., Charles S. Haight, Jr., Atty., Ad-
miralty & Shipping Section, Dept. of
Justice, Washington, D. C., Leavenworth
Colby, Chief, Admiralty & Shipping Sec-
tion, Dept. of Justice, James L. Pimper,
Asst. Gen. Counsel, Maritime Adminis-
tration, Washington, D. C., for defend-
ants.

MORRIS, District Judge.

The plaintiff, hereinafter referred to
as Cuba Mail, and Agwilines, Inc., here-
inafter referred to as Agwilines, were at
all times pertinent herein wholly-owned
subsidiaries of Atlantic Gulf and West
Indies Steamship Lines, Inc., a Maine
corporation, hereinafter referred to as
AGWI. Cuba Mail was from December
31, 1937, to December 31, 1953, a con-
tractor under a subsidy agreement with
the United States Maritime Commission
for operation of a foreign trade line,
route or service, declared to be essential
by the United States Maritime Commis-
sion, which agreement and operations
thereunder were interrupted by World
War II. The last operating-differential
subsidy agreement between Cuba Mail
and the Federal Maritime Board, Num-
ber FMB-13, was executed on August
16, 1951, and, by its terms, was made
retroactive to January 1, 1948. In 1946
Cuba Mail, pursuant to the Ship Sales
Act of 1946, 60 Stat. 41, 50 U.S.C.A.
Appendix, § 1735 et seq. (providing for
the sale or chartering of government-
owned, war-built merchant vessels), ap-
plied to the Maritime Commission for the
purchase of two vessels for operation in
the subsidized service. The Commission
assigned the two vessels involved in this
suit to Cuba Mail for purchase, and in
January 1947 Cuba Mail applied to the

Commission for a construction subsidy under Title V of the Merchant Marine Act of 1936, 49 Stat. 1985, as amended, 46 U.S.C.A. § 1101 et seq., hereinafter referred to as the Act, to reconstruct these two vessels. The Commission did not approve this application, but suggested the purchase by Cuba Mail of three other vessels, to be "put in class" by the Commission prior to sale. Cuba Mail thereafter, on April 22, 1947, signed contract of sale No. MCc-60062 for the purchase of the other three vessels, and the two vessels involved herein were purchased by Agwilines, which did not have an operating-differential subsidy contract, in July and October 1947. Because of the passage by Congress of the 1948 Independent Appropriation Act, which did not provide funds for reconversion work, the Commission could not put the three vessels in class, and so advised Cuba Mail, and the contract for their purchase was cancelled by mutual consent of the parties. The affiliated group management (the parent AGWI and subsidiaries Agwilines and Cuba Mail) decided that the two vessels herein involved, which had been purchased by Agwilines, should be bareboat chartered to Cuba Mail for operation under its operating-differential subsidy contract. These vessels were withdrawn from non-subsidized service for reconstruction necessary to put them in class for use by Cuba Mail in its subsidized service. The total cost of such reconstruction was $1,124,528.41, which was paid by Agwilines from its general funds. The vessels were then bareboat chartered to Cuba Mail, which requested formal approval of them as chartered vessels for operation in the subsidized service by the Maritime Commission. It was determined by the Maritime Commission that ownership of the vessels by Cuba Mail was a prerequisite to its eligibility for payments under its operating subsidy contract. Thereafter, on June 23, 1948, a tripartite agreement, approved by the Maritime Commission, was entered into by AGWI, Agwilines and Cuba Mail, pursuant to which AGWI transferred to Agwilines for retirement 36,347 shares of Agwilines' common stock owned by AGWI, Agwilines transferred title to the two vessels to Cuba Mail, and Cuba Mail issued and transferred to AGWI 11,615 shares of its authorized and unissued common stock. The book value of the stock of Agwilines and of Cuba Mail thus transferred equalled the amount expended by Agwilines for purchase and reconstruction of the vessels, less depreciation.

Section 607(b) of the Act requires an operator under an operating-differential subsidy contract to maintain a "capital reserve fund," and provides:

"From the capital reserve fund so created, the contractor may pay the principal, when due, on all notes secured by mortgage on the subsidized vessels and may make disbursements for the purchase of replacement vessels or reconstruction of vessels or additional vessels to be employed by the contractor on an essential foreign-trade line, route, or service approved by the Commission, but payments from the capital reserve fund shall not be made for any other purpose. The contractor may, with the consent of the Commission, pay from said fund any sums owing but not yet due on notes secured by mortgages on subsidized vessels."

Section 607(f) provides:

"Unless otherwise provided in the operating-differential subsidy contract, upon the termination of any such contract, the reserve funds required under this chapter shall be the property of the contractor, except for such amounts as may be due the United States."

Section 607(h) provides:

"The earnings of any contractor receiving an operating-differential subsidy under authority of this chapter, which are deposited in the contractor's reserve funds as provided in this section, except earnings withdrawn from the special reserve

funds and paid into the contractor's general funds or distributed as dividends or bonuses as provided in paragraph 4 of subsection (c) of this section, shall be exempt from all Federal taxes. Earnings withdrawn from such special reserve fund shall be taxable as if earned during the year of withdrawal from such fund."

Under the authority of Section 3760 of the Internal Revenue Code,[1] and to clarify ambiguities apparently recognized in Section 607(h), the Treasury Department entered into negotiations with the industry, which resulted in a form closing agreement dated July 21, 1947. This closing agreement was entered into between all subsidized operators, including Cuba Mail, and the Treasury Department, Article X(e) of which reads:

Tax exempt income deposited in the taxpayer's Reserve funds and committed and applied toward the acquisition of or payment for a vessel, or for reconstruction or reconditioning of a vessel, shall be treated as capital for all purposes from the date of such commitment.

The Commissioner of Internal Revenue, in answer to questions raised by the industry, issued an "interpretative bulletin" concerning the closing agreement, reading in pertinent part as follows:

What is the purpose of Article X (e)?

*Answer:* Its purpose is to make clear that deposits of income, which are temporarily and conditionally tax-exempt under Article II or III (a) (b), will achieve a permanent and absolute exemption when "committed and applied toward the acquisition of or payment for a vessel." When so applied, deposits of tax exempt income will be treated as "capital for all purposes" and this status relates back to the "date of such commitment."

Its operating subsidy contract having terminated on December 31, 1953, Cuba Mail requested the Maritime Administration[2] on February 8, 1954, to approve the withdrawal of all cash and securities on deposit in its capital and special reserve funds, and to approve the withdrawal of $1,161,407.48 (representing that part of the purchase price of the vessels, $36,879.07, paid out of the general funds of Agwilines and the cost of reconstructing them, $1,124,528.41, also paid out of the general funds of Agwilines) from its capital reserve fund "in reimbursement of the general funds of the company" for monies expended for the purchase and reconstruction of the two vessels. The former request, as it related to the capital reserve fund, was approved up to $4,000,000 on March 26, 1954, and the latter request was denied on October 7, 1954, by defendant Rothschild. Withdrawal of the balance of the capital reserve fund was authorized by letter dated February 11, 1955.

Asserting that the denial of defendant Rothschild is arbitrary and capricious, the defendant, the Maritime Administrator, is without authority or discretion to withhold approval of the withdrawal of the funds for reimbursement, and that it is and will continue to be seriously and irreparably damaged by their denial, Cuba Mail brought this suit praying that the defendants be directed to approve the requested withdrawal from its capital reserve fund for reimbursement of its general funds, and that the Court adjudge that the sum of $1,161,407.48 was expended for the acquisition and reconstruction of the vessels involved.

Defendants filed a motion to dismiss for lack of jurisdiction of this Court over the subject matter for the reasons (1) the controversy is one with respect to

---

1. "(a) Authorization. The Commissioner (or any officer or employee of the Bureau of Internal Revenue, including the field service, authorized in writing by the Commissioner) is authorized to enter into an agreement in writing with any person relating to the liability of such person (or of the person or estate for whom he acts) in respect of any in-

ternal revenue tax for any taxable period." 26 U.S.C.A. § 3760.

2. The Commission was abolished on May 4, 1950, and the Administration was created by Part II of Reorganization Plan No. 21 of 1950, 15 F.R. 3178, 3 C.F.R., 150 Supp. 175, 64 Stat. 1273, 46 U.S.C.A. § 1111 note.

federal taxes, in which the United States has not consented to be sued in the manner attempted herein, (2) the suit is in substance an action against the United States, to which it has not consented to be sued, (3) plaintiff lacks the standing to sue, (4) no justiciable controversy is presented, (5) adequate remedies at law exist for the enforcement of the rights sought to be protected, and (6) for the reason (first advanced in supplemental memorandum filed February 27, 1957, subsequent to the original hearing on the motion on November 1, 1956, an additional hearing having been requested in the interim) plaintiff permitted, prior to commencing this action, any controversy between itself and defendants to become moot. The requested additional hearing was had on April 5, 1957.

Cuba Mail's contract with the Maritime Administration having terminated, and all of the monies in its capital reserve fund having been withdrawn for its general use, the only legal significance of any consequence to be derived from either the injunctive relief or the declaratory judgment sought, and the only real benefit which might thereby inure to Cuba Mail is a reduced tax liability. (Values of its assets and capital stock, its general financial stability and aid in making proper bookkeeping entries are urged by plaintiff as rights which are violated by the action of defendants.)

As developed by defendants' requests for admission of facts, and plaintiff's admission that each of the statements inquired into thereby is true, AGWI filed with the District Director of Internal Revenue a federal consolidated income tax return for itself and subsidiary companies, including Cuba Mail, in which the sum of $1,161,407.48 was deducted from the total on deposit in Cuba Mail's reserve funds as of December 31, 1953, justification for which was stated as follows:

Reimbursement as at December 31, 1953 of general funds with respect to amounts expended for the purchase and reconstruction of the vessels * * *— (employed by New York and Cuba Mail Steamship Co. on an essential foreign trade service)—under the provisions of Section 607(b) of the Merchant Marine Act of 1936.

This makes it quite evident that the very actual and practical "case or controversy" here involved is the question of tax liability, and it is also evident that this question should be settled by either the administrative authority of the Government having control of tax matters or by a court authorized by the Congress to review and determine the legality of such action. The question of whether or not the application of monies in the capital reserve fund in circumstances where, as here, capital stock instead of the fund itself was used for the acquisition and reconstruction of vessels under subsidy contracts is a matter solely to be determined in the discretion of the Maritime Administration can certainly be determined by any court having jurisdiction of the tax liability. If such matter is solely within the discretion of such authority, it is clear that neither this Court nor any other can direct how that discretion should have been, or should now be, exercised. If, on the other hand, as seems to be the real contention of the plaintiff, such application is required by the real intent of the Act, then it is equally clear that a court having jurisdiction of the tax controversy could give the relief which is here sought. The Congress has constituted the Tax Court as a forum in which a deficiency assessment can be questioned, from which Court appeals may be taken to the appropriate Circuit Court of Appeals. Congress has also provided that, where a tax is paid, a suit for refund thereof may be maintained in the appropriate United States District Court or the Court of Claims. National Enforcement Commission v. Slim Olson, Inc., 95 U.S.App.D.C. 218, 221 F.2d 92. It is thus evident that the relief here sought can be obtained under the procedures which have been provided by Congress, and, therefore, it would be beyond the scope of this Court to entertain the present proceedings for declaratory judgment and injunctive re-

lief. American President Lines, Ltd. v. Federal Maritime Board, 98 U.S.App. D.C. 259, 235 F.2d 18.

The motion of defendants to dismiss for lack of jurisdiction in this Court will be granted. Counsel will prepare an appropriate order to carry this decision into effect.